903 P.2d 90

Bruce J. CLAY, Claimant–Respondent,

v.

BMC WEST TRUSS PLANT,
Employer–Appellant,

and

State of Idaho, Department of
Employment, Defendant–
Respondent.

No. 21335.

Supreme Court of Idaho,
Boise, May 1995 Term.

Sept. 28, 1995.

Moffatt, Thomas, Barrett, Rock & Fields, Chtd., Boise, for appellant, BMC West Truss Plant.

Bruce J. Clay, Idaho Falls, pro se, respondent.

Larry EchoHawk, Attorney General, and Jane M. Newby, Deputy Attorney General, Boise, for respondent, State of Idaho, Department of Employment.

SCHROEDER, Justice.

BMC West Truss Plant appeals from an Industrial Commission decision in favor of Bruce J. Clay's claim for unemployment benefits. BMC appeals the Industrial Commission's conclusions that: (1) Clay did not voluntarily quit his employment; (2) Clay was discharged from employment but not for misconduct; and (3) Clay is able to work, and available for and seeking suitable work.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

BMC West Truss Plant (BMC) owns and operates a truss manufacturing plant in Idaho Falls. Bruce J. Clay (Clay), was employed by BMC as a sawyer at the plant. Trusses are made in an assembly process, and a sawyer's mistake at the head of the assembly line halts the production process on that truss until a new cut is made. Clay's supervisor, Dan West, was advised that Clay had made a mistake in cutting some 2 × 8 lumber. West confronted Clay in the employee break room and made a comment about Clay taking a break rather than recutting the lumber. Clay testified that West threw a clipboard at him which hit his right shin. West testified that he dropped the clipboard on the ground and left the room. Whatever the facts of the incident, Clay told West he was going to quit, but West convinced him to return to work. Clay had an abrasion on his leg examined at the emergency room of Eastern Idaho Regional Medical Center two days later. He received a psychiatric referral for crisis counseling.

On June, 14 and 15, 1993, Clay's wife informed BMC that he would not be in to work because he was sick. A Department of Health and Welfare counselor recommended that Clay get professional treatment for depression. Clay did not return to work and was examined by Dr. Karn on June 22, 1993. Dr. Karn recommended that Clay stay off work for a couple of weeks due to depression, and a copy of this statement was given to BMC.

On July 1, 1993, Dr. Karn advised Clay that he would only treat him for Attention Deficit Disorder, not depression, and he did not want to get involved in a dispute between BMC and Clay. That same day, BMC's district manager contacted Clay by telephone and advised him that Dr. Karn had signed a release for him to return to work immediately and he could be transferred to the door shop, away from West. Clay told the district manager that Dr. Karn had not personally informed him that he was released to return to work, and that he would not rely on hearsay coming from the employer. BMC and Clay dispute whether or not Clay said he would return to work on July 2, 1993. He did not return to work on July 2, and he told the district manager that he would not report to work until July 6, after his medical leave of absence from Dr. Karn expired.

That same day, Clay saw Dr. Thana Singarajah[1] who recommended that he be hospitalized for suicidal depression. Clay also met with Dr. Stephen DeNagy, who concurred with Dr. Singarajah's diagnosis. Clay was hospitalized at Charter Summit Hospital in Salt Lake City, Utah, from July 3, to July 7, 1993.

When Clay did not return to work on July 6, 1993, BMC's district manager mailed him a letter:

> Based on information from the Doctor on July 1, and other information we have received we consider you a voluntary termination effective July 1st.
>
> If there is any other medical information we should consider, let us know as soon as

---

1. The Appeals Examiner mistakenly refers to Dr. Singarajah as Dr. *"Phana"* Singarajah. Also, in the transcript at p. 87, Dr. *Thana* Singarajah is mistakenly identified as "Dr. Tanner".

possible, but no later than Friday, July 9th.

The letter was mailed to an old address, and Clay testified that he did not know of the letter's content until he received a photocopy of the original by certified mail on July 20, 1993.

Neither Clay nor his wife contacted BMC regarding his continued absence until July 12, 1993, when he dropped off a statement from Dr. Singarajah to the effect that Clay's depression was work-related, and he should stay off work until further notice from Dr. Singarajah. Clay contacted BMC on July 19, 1993, with another statement from Dr. Singarajah reiterating the same information.

At this time Clay learned of the letter sent by BMC on July 6th to his former address characterizing his absence as of July 1st as a "voluntary termination." That same day he filed a claim for unemployment benefits, and Dr. Singarajah submitted a medical report to the local Job Service office releasing him to work full-time, "as long as it is not at BMC West or lumber/carpentry-related industry."

On August 6, 1993, a D.O.E. claims examiner issued a benefits determination finding that Clay had been discharged by BMC and that the discharge was not due to misconduct. However, the examiner determined that Clay was ineligible for unemployment benefits because he was not able to work, and available for and seeking suitable work. Subsequently an appeals examiner found that Clay was ineligible for benefits because he voluntarily quit his employment without good cause and failed to establish that he was able to work and available for and seeking suitable work. However, on appeal to the Industrial Commission (Commission), the Commission concluded that under the unique circumstances of this case Clay acted as a reasonably prudent person in keeping BMC apprised of his whereabouts and that Clay did not quit voluntarily but was discharged by BMC. The Commission also concluded that BMC failed to prove its allegation that Clay's failure to report his whereabouts to BMC from July 2nd until July 12th constituted a substantial disregard of the employer's interest and that his failure to accept BMC's offer of employment in the door shop beginning July 2 was excusable due to illness. The Commission determined that Clay was able to work, and available for and seeking suitable work but did not discuss the facts as to the issue as they existed at the time Clay filed his claim for unemployment benefits or review the facts as of the date of the hearing before the appeals examiner, September 28, 1993.

BMC appealed. Clay did not file a responsive brief. The Commission's position has been represented on appeal by a deputy attorney general on behalf of the D.O.E.

## II.

### THE COMMISSION'S DETERMINATIONS THAT THE EMPLOYEE DID NOT VOLUNTARILY QUIT EMPLOYMENT AND WAS NOT DISCHARGED FOR MISCONDUCT ARE SUPPORTED BY SUBSTANTIAL AND COMPETENT EVIDENCE

■ The question of whether an unemployment compensation claimant has met statutory eligibility requirements is a question of fact for the Commission, and if the Commission's resolution is supported by substantial and competent evidence, it will not be overturned on appeal. *Laundry v. Franciscan Health Care Center*, 125 Idaho 279, 869 P.2d 1374 (1994); IDAHO CONST. art. 5 § 9.

### A. GOOD CAUSE

■ BMC argues that *Doran v. Employment Sec. Agency*, 75 Idaho 94, 97, 267 P.2d 628, 630 (1954), establishes the rule that an employee who temporarily leaves employment without advising his employer of the reason and who fails to seek a leave of absence and keep his employer informed of his intentions and prospects of return is deemed to have quit the employment without good cause. However, *Doran* does not establish a bright line rule to that effect. The test is one of reasonableness under the circumstances.

In *Peters v. Drake Mechanical*, 108 Idaho 610, 701 P.2d 230 (1985), this Court held that quitting work that is not suitable work is

always good cause, *Id.* at 613, 701 P.2d at 233. The degree of risk to an individual's health is a factor to be considered in determining whether or not work is suitable for an individual. I.C. § 72–1366(g).[2]

Dr. Singarajah concluded that Clay's depression was work-related. Even if one characterized Clay's unexplained absence between July 6th and July 12th as a voluntary termination of employment, the Commission could find that the termination was for good cause under *Peters* and the definition of suitable work in I.C. § 72–1366(g).

*Steffen v. Davison, Copple,* 120 Idaho 129, 814 P.2d 29 (1991), outlines the test for determining whether a claimant has established good cause for voluntarily leaving employment:

> our cases provide that the circumstances which compel the decision to leave employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances, and the standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman. We have held that the test to be used to determine good cause is whether a reasonable person would consider the circumstances resulting in a claimant's unemployment to be real, substantial and compelling.

*Id.* at 132, 814 P.2d at 32 (citations omitted).

This Court held in *Doran* that an employee has a duty to: (1) advise an employer of the reason for his or her absence; (2) seek a leave of absence; and (3) keep the employer informed of his or her intentions and prospects of returning to work. However, the Court also recognized that individual circumstances may vary those duties. The standard is that "good faith on the part of the employee must always appear," and the employee must "act as a reasonably prudent

person would in keeping contact with his employer and in securing the permanence of his employment." *Doran,* 75 Idaho at 97, 267 P.2d at 630.

The question presented is whether it was reasonable for Clay to fail to contact his employer about his continued absence from work while undergoing intensive, in-patient treatment for employment related suicidal depression. The Commission determined the following:

> Although Claimant and Employer dispute whether Claimant revealed to Employer that he would be seeking further treatment, it is clear that Claimant was hospitalized on Doctors Singarajah's and DeNagy's orders from July 3, 1993 to July 7, 1993, in Salt Lake City, Utah, as a suicide risk and did not notify his Employer of his situation until July 12, 1993. Despite the fact that nearly a week passed without Claimant contacting his Employer, under the unique circumstances of this case— namely that, as a suicide risk, Claimant's access to a phone was somewhat restricted and that he associated work with his severe emotional problems—Claimant did not take an unreasonably long time to notify his employer.

The Commission's conclusion is supported by substantial and competent evidence.

## B. MISCONDUCT

This Court recently reiterated the underlying definition of "misconduct" that governs whether a discharged employee is eligible for unemployment benefits:

> This Court has articulated a test for three types of conduct to determine whether an employee is ineligible for unemployment benefits due to a discharge based on "misconduct" as used in I.C. § 72–1366(e) by defining misconduct as "willful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of be-

2. **72–1366. Personal eligibility conditions.**—The personal eligibility conditions of a benefit claimant are that—

. . . .

(g) In determining for the purposes of this act, whether or not work is suitable for an individual, the degree of risk involved to his health, safety,

morals, his physical fitness, experience, training, past earnings, length of unemployment and prospects for obtaining local employment in his customary occupation, the distance of the work from his residence, and other pertinent factors shall be considered. . . .

havior which the employer has a right to expect of his employees." *Puckett v. Idaho Dep't of Corrections,* 107 Idaho 1022, 1023, 695 P.2d 407, 408 (quotations omitted).

We have further subdivided the test for the third type of conduct by bifurcating the test for "standards of behavior" misconduct into an evaluation of "(1) whether the employee's conduct fell below the standard of behavior expected by the employer; and (2) whether the employer's expectation was objectively reasonable in the particular case." *Id.* at 1023–24, 695 P.2d at 408–09. The tests for the first two types of misconduct are clearly factual determinations. We have previously said that the third test is also a question of fact. *Puckett,* 107 Idaho at 1024, 695 P.2d at 409.

*Campbell v. Bonneville County Bd. of Commrs,* 126 Idaho 222, 225, 880 P.2d 252, 255 (1994).

■ If the Commission's resolution of a question of fact is supported by substantial and competent evidence, it will not be overturned on appeal. *Laundry v. Franciscan Health Care Center,* 125 Idaho 279, 869 P.2d 1374 (1994); IDAHO CONST. art. 5 § 9.

■ BMC argues that Clay's failure to notify BMC of his whereabouts from July 6th until July 12th did not conform to BMC's objectively reasonable expectations of behavior. However, at the hearing before the appeals examiner, BMC argued that Clay's conduct was a "deliberate disregard" of BMC's "legitimate right to expect [Clay] to let them know where he was and when he'd be back to work." Consequently, the Commission analyzed Clay's conduct under the willful or intentional disregard of an employer's interest standard for employee misconduct. The Commission did not specifically find that Clay's conduct did not amount to willful or intentional disregard of BMC's interest. However, it made the finding that Clay's conduct was "understandable" given his emotional problems which he associated with his employment. Therefore, his actions did not constitute misconduct.

■ The Commission did not specifically analyze the question of misconduct under the standards-of-behavior test that BMC urges. This raises the question of whether the case must be remanded to the Commission to make specific findings concerning the standards of behavior test. See *Dietz v. Minidoka County Highway Dist.* and *State Department of Employment,* 95.13 ISCR 521 (Commission failed to examine each of the three grounds comprising the definition of misconduct, resulting in remand to consider all three grounds). In *Dietz* the employer asserted all three grounds of misconduct, but the Commission's decision resolved only one ground. Nothing in the decision allowed this Court to determine how it would have decided the remaining issues. However, in this case the Commission's findings are sufficient to establish its determination that Clay's conduct did not constitute misconduct under the standards-of-behavior test. Failure to advise BMC of his whereabouts from July 6th until July 12th fell below the standard of behavior expected by BMC, but the clear implication of the Commission's determination is that BMC's expectation was not objectively reasonable under the circumstances: "Claimant's behavior in not keeping Employer fully apprised of his whereabouts is understandable as the result of his emotional problems, which Claimant associated with his workplace."

The Commission's conclusion is based on substantial and competent evidence.

## III.

**THERE WAS NOT SUBSTANTIAL, COMPETENT EVIDENCE IN THE RECORD TO SUPPORT THE COMMISSION'S DETERMINATION THAT CLAY ESTABLISHED HIS AVAILABILITY FOR SUITABLE WORK**

■ In order to be eligible for unemployment benefits, a claimant must be able to work, available for suitable work and seeking work. I.C. § 72–1366(d).[3] Claimants will

---

3. **72–1366. Personal eligibility conditions.**—The personal eligibility conditions of a benefit claim-
ant are that—
. . . .

not be denied benefits they otherwise would be entitled to if the failure to be able to work, available for suitable work, and seeking work is due to an illness or disability which occurs *after* the claimant has filed a claim for benefits and registered for work. I.C. § 72–1366(d). Three times in his claim for unemployment benefits, Clay stated that he would not be seeking employment until he received a release from his doctor. Dr. Singarajah stated in a letter to BMC dated July 19, 1993—the same day Clay filed a claim for benefits—that Clay would not be able to work until some unspecified time in the future.

The Commission erroneously based it conclusion that Clay was able to work, and available for and seeking suitable work on facts which preceded his discharge by BMC and the time he made his claim for unemployment benefits. The Commission did not specifically address the appeals examiner's conclusion that Clay's evidence on this issue as of the date of his claim for benefits was inconsistent. There may be substantial and competent evidence in the record to support a conclusion that Clay meets the eligibility requirements of I.C. § 72–1366(d), but that issue presents a question of fact over which the Industrial Commission has exclusive jurisdiction and must rule, applying the proper eligibility requirements, before this Court can act further.

### IV.

### CONCLUSION

The Commission's decisions that: (1) Clay did not voluntarily quit his employment with BMC; and (2) Clay was discharged by BMC, but not for misconduct are affirmed. The Commission's decision that Clay met the personal eligibility requirements of I.C. § 72–1366(d) is remanded for determination based on the relevant facts in the record as of the time he filed his claim for benefits. Each

party has prevailed in part on appeal. Neither party is awarded costs.

McDEVITT, C.J., and JOHNSON, TROUT and SILAK, JJ., concur.

(d) During the whole of any week with respect to which he claims benefits or credit to his waiting period he was able to work, available for suitable work, and seeking work; provided, however, that no claimant shall be considered ineligible in any week of unemployment for failure to comply with the provisions of this subsection if such failure is

due to an illness or disability which occurs after he has filed a claim and registered for work and after the beginning of such illness or disability, no suitable work has been available for the claimant that would have provided wages greater than one-half (½) of the claimant's weekly benefit amount; ...